1
2
3
4
5
6          **IN THE UNITED STATES DISTRICT COURT**

7          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9   ROSE MARY DUNCAN,              )          Case No. 07-cv-1578-OWW-TAG
                                   )
10              Plaintiff,         )          FINDINGS AND RECOMMENDATIONS
                                   )          ON APPEAL FROM ADMINISTRATIVE
11      v.                         )          DECISION
                                   )
12  MICHAEL J. ASTRUE,[1]          )          11-DAY DEADLINE TO FILE OBJECTIONS
    Commissioner of Social Security, )
13                                 )
                Defendant.         )
14  _____)

15                          **INTRODUCTION**

16          Rose Mary Duncan ("Claimant" or "Plaintiff") seeks judicial review of an administrative

17  decision denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social

18  Security Act (the "Act"), 42 U.S.C. §§ 1381 et seq.  Pending before the Court is Claimant's appeal

19  from the administrative decision of the Commissioner of Social Security ("Commissioner").  This is

20  the third time that Claimant's case has come before the Court.  There have been two prior stipulated

21  remands.

22                          **JURISDICTION**

23          Claimant's case originated on January 7, 1998, when she protectively filed an application for

24  SSI, alleging an onset date of June 1, 1995.  (Administrative Record ("AR") 70-77).   On April 6,

25  1999, Claimant filed a formal application for benefits, asserting that a heart condition was her

26  disabling impairment and alleging an onset date of "8/1998/2/9/99 [*sic*]."  (AR 78-84).  Claimant's

27  _____

28          [1] Michael J. Astrue is the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g); Fed. R. Civ.
    P. 25(d)(1).

                                        1

SSI application was denied initially and on reconsideration.  (AR 54-57, 60-63, 82-84).   After a timely request for a hearing, Claimant and her counsel appeared before Administrative Law Judge ("ALJ") Rocklin Lyons on April 18, 2002.  (AR  572-590).  On June 18, 2002, the ALJ issued a written decision finding that Claimant was not disabled for purposes of SSI.  (AR 19-25).  On June 27, 2003, the Appeals Council denied Claimant's request for review whereupon the June 18, 2002 decision was final for purposes of judicial review.  (AR 5-7).

On August 28, 2003, Claimant filed an action for review in this Court.  *See Rose M. Duncan v. Commissioner of Social Security*, United States District Court, Eastern District of California case number 1:03-cv-06170 DLB, Doc. 1 (the "first appeal").  While Claimant's first appeal was pending, the parties stipulated to a remand, and the matter was remanded for further administrative proceedings. (AR 631-635, 638-639).

On March 16, 2005, Claimant and her counsel appeared for a hearing before ALJ James Berry. (AR 775-809).  Claimant as well as vocational expert (sometimes "VE") Judith Najarian testified at the hearing.  On April 25, 2005, the ALJ issued a written decision finding that Claimant was not disabled for purposes of SSI.  (AR 594-601).  On July 7, 2005, Claimant commenced an action for review in this Court.  *See Rosemary Duncan v. Commissioner of Social Security*, United States District Court case number 1:05-cv-0884 TAG, Doc. 1 (the "second appeal").  While Claimant's second appeal was pending, the parties again stipulated to a remand, whereupon the matter was remanded for further administrative proceedings.  (AR 828-835).

ALJ Berry conducted further proceedings on remand on September 18, 2006 (AR 1091-1118), November 15, 2006 (AR 1119-1142), and June 26, 2007 (AR 1080-1088).  Claimant and her counsel appeared at those hearings.  The ALJ heard testimony from Claimant, orthopedic surgeon Manny Karbelnig, M.D.,  and vocational expert Judith Najarian.  (AR 1078-1142).  ALJ Berry also admitted into evidence and considered the written report of psychiatrist Charles Agler, M.D.  (AR 1080-1081; AR 1061-1072).  On July 5, 2007,  ALJ Berry issued a written decision in which he again denied Claimant's application for SSI.  (AR 810-825.)

Written notification of ALJ Berry's decision, including a copy of the decision itself, was sent to Claimant by the ALJ on July 5, 2007.  (AR 810-825.)  Claimant filed no exceptions to the July 5,

2007 decision of the ALJ and the Appeals Council did not take jurisdiction within 60 days after the date of the ALJ's decision.  Consequently, that decision became the final decision of the Commissioner after remand on or about September 3, 2007.  20 C.F.R. § 416.1484(d).

The final decision of the Commissioner is appealable to the district court pursuant to 42 U.S.C. § 405(g).  The initiation of an appeal in the district court must be commenced within 60 days after notice is mailed to the claimant of the Commissioner's final decision or within such further time as the Commissioner of Social Security may allow.  *Id.*   In its written notice of the ALJ's decision sent to Claimant on July 5, 2007, Claimant was advised that if she did not file written exceptions to the decision and the Appeals Council did not act on its own motion, the ALJ's decision would become the final decision of the Commissioner after remand on the sixty-first day after July 5, 2007.  Claimant would then have the right to file a new civil action seeking federal district court review of the Commissioner's final decision for a period of sixty days beginning on the  date the ALJ's decision became final.  (AR 811).

On October 29, 2007, Claimant timely filed this action.  (Doc. 1).

## RELEVANT ADMINISTRATIVE FINDINGS AND RULINGS

1. First ALJ Berry Ruling

In the April 2005 decision that give rise to the remand order underlying the *instant* appeal, ALJ Berry's evaluation of the evidence included the following discussion.  The Court quotes lengthy portions of this ruling because they are central to the Court's conclusion and recommendations.

> The medical evidence indicates that the claimant has coronary artery disease and degenerative joint disease.  These impairments are severe within the meaning of the Regulations. [She] does not have any impairment or combination of impairments meeting or equaling the criteria under any section of Appendix 1, Subpart P, Regulations No. 4.  (AR 594-595).
> ...
>
> In March 2002, the claimant complained of shortness of breath when walking more than one-half mile or doing laundry.  She was diagnosed with chronic obstructive pulmonary disease and was advised to stop smoking and given inhalers.  She was routinely treated with requests for refills.  (AR 596).
> ...
>
> In February 1999, the claimant had complaints of chest pain and subsequently had a nuclear medicine stress test, which revealed abnormal

findings indicative of ischemia in the inferior wall of the left ventricle. She was found to have non-Q-wave myocardial infarction and was treated with aspirin, Tenormin, and IV Heparin. An exercise treadmill test was negative but was suboptimal as the claimant only reached about 70% of her target heart rate. An echocardiogram showed left ventricular ejection fraction and wall motion with normal limits with an estimate ejection fraction about 55%. There were no regional wall motion abnormalities noted or no pericardial effusion or mural thrombus and no vegetation. Doppler study showed trivially to 1+ mitral regurgitation and trivial tricuspid regurgitation. In March 1999, the claimant underwent an intravenous persantine stress test. The claimant did not complain of chest pain, and there was no ventricular arrhythmia or supraventricular tachyaarrhythmia.

In May 1999, Dr. Amarjit Chahil consultatively examined the claimant. The claimant reported ongoing problems with chest pain since 1989 and stress since 1995. She also reported that she had four grown kids that she supported. On physical examination, the claimant appeared angry and hostile and was reluctant to give history. Pulses were regular, and there was no audible murmur or gallop or evidence of ankle swelling. The claimant was able to stand on toes, heels, hop on one foot, and tandem walk. Finger-to-nose and heel-to-knee test was normal, and Romberg was negative. The claimant had a good handgrip with both hands, and muscle strength was 5/5 in all muscles in the upper and lower extremities. Muscle bulk and tone were within normal limits. Dr. Cahill diagnosed status post non-Q wave myocardial infarction and probably depression.

The claimant underwent left heart catheterization, left ventricular angiography, and selective right and left coronary artery angiography via Judkins technique in February 2000. There was a mild left ventricular dysfunction and triple vessel coronary artery disease. The claimant was a candidate for myordcardial revascularization surgery and was referred to Valley Heart Surgeons. A pulmonary function test in March 2000 suggested a mild obstructive airways disease with no definite response to bronchodilator therapy. Lung volumes were essentially normal, but with an increased RV/TLC ratio. Chest x-ray showed no active cardiopulmonary disease. The claimant underwent three coronary arteries bypass grafting surgery. By the end of April 2000, the claimant had no complaints other than mild soreness in her chest and was progressing well. (AR 596-597).

In November 2000, the claimant saw Dr. Chenn-Yow Fuh for complaints of leg cramps, weakness, and tiredness when she walked around the block. A Doppler study showed left ventricle revealed [*sic*] concentric hypertrophy with normal systolic function and normal wall motion, and there was trivial mitral regurgitation and tricuspid regurgitation noted. A bilateral carotid Doppler sonogram in July 2001 showed no evidence for a hemodynamically significant stenosis and the pressures corresponded with a normal to mild stenosis of the extracranial carotid arteries. The claimant denied any chest pain.

On September 3, 2004, the claimant called and complained of sharp chest pain and was instructed to go to the emergency room; however, she felt she could wait for her appointment on September 8, 2004.
...

4

The Administrative Law Judge has also considered the medical opinions, which are statements from acceptable medical sources.  These statements reflect judgments about the nature and severity of the impairments as well as resulting limitations (20 CFR § 416.927 and Social Security Rulings 96-2p and 96-6p).

The State Agency physicians concluded the claimant could lift and carry 25 pounds occasionally and 10 pounds frequently and sit, stand, and walk for 6 hours.  The Administrative Law Judge finds that, reasonably considering the claimant's subjective complaints in light of the minimal objective physical and mental findings, the opinions of the State Agency physicians are inconsistent with the objective medical evidence.  Greater weight is given to Dr. Cahill's opinion that the claimant could lift 25 pounds occasionally, and sit, stand, and walk with breaks every 2 hours during an 8-hour work shift (Exhibit 10F, p. 4).

In a Disability Verification to Merced College dated in March 1999, Dr. Lopez reported the claimant had coronary heart disease that was permanent and chronic (Exhibit 9F, p. 2.)  This report does not include specific work-related limitations or the medical evidence to support the cause for limitations and is assigned little weight.  In April 2002, Dr. Ayala wrote that the claimant was disabled from any form of employment.  Dr. Ayala noted the claimant could never carry 20 pounds and rarely carry less than 10 pounds, sit and stand for 15 minutes, occasionally twist, rarely stoop, crouch, and climb stairs, and never climb ladders, and should avoid concentrated exposure to humidity and all exposure to extreme cold and heat, fumes, odors, dusts, gases, poor ventilation and hazardous machinery and heights (Exhibits 20F; 21F). In September 2004, Dr. Ayala reported the claimant could never carry 20 pounds and rarely carry less than 10 pounds, sit for 10 minutes, stand for 5 minutes, occasionally twist, stoop, rarely crouch, and never climb stairs, and never climb ladders, and should avoid concentrated exposure to humidity, avoid even moderate exposure to extreme cold and heat and all exposure to fumes, odors, dusts, gases, poor ventilation and hazardous machinery and heights (Exhibits 22F, p. 5).  Careful consideration has been given to these opinions.  However, because these opinions about the claimant's ability to perform past work history or any work concerns an issue reserved to the Commissioner and are not an opinion as to the nature or severity of the claimant's impairment, they cannot be accorded special weight (20 CFR § 416.927(e) and Social Security Ruling 96-5p). Dr. Ayala apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Additionally, one might expect to see some indication in the treatment records of restrictions placed on the claimant by this doctor, but a review of the record in this case reveals no such restrictions. (AR 594-600.)

This ruling was flawed and became the basis for the most recent remand.

///

///

5

2.  Appeals Council Remand Order

The "Order of Appeals Council Remanding Case to the Administrative Law Judge" was

dated March 20, 2006, and stated, in pertinent part:

> The Appeals Council hereby vacates the final decision of the
> Commissioner of Social Security and remands this case to an
> Administrative Law Judge for further proceedings consistent with the
> order of this court. ... The finding of medium work in the decision
> contrasts with the light residual functional capacity found in the first
> decision and the current Administrative Law Judge does not appear to
> have properly complied with the Appeals Council remand order on this
> issue.  The medium level residual functional capacity determination is not
> clearly explained and the physician cited in support of the finding,
> Dr. Cahill, in fact, did not support it as he limited the claimant to lifting 25
> pounds occasionally with breaks required every two hours.  Also, the
> opinions of two treating physicians which were more restrictive than the
> ALJ, Drs. Lopez and Ayala, were rejected, in part, for relying on the
> claimant's subjective complaints, but the rationale provided is not
> sufficient.  Since the claimant was found able to perform her past relevant
> medium work the issues of the residual functional capacity finding and the
> physician opinions should be further considered.
> (AR 828).
>
> A cardiologist report from Dr. Chenn-Yow Fuh is apparently missing
> some pages and an effort should be made to obtain this missing material
> and further consider the claimant's heart disease and breathing problems.
>
> Upon remand to an Administrative Law Judge, the medical source
> opinions, particularly those of  Drs. Cahill, Lopez, and Ayala[2] should be
> further considered and specific reasons given if they are not accepted.  The
> complete report of Dr. Chenn-Yow Fuh should be obtained, if available,
> and the claimant's heart condition should be further addressed.  (Citation
> to AR omitted).  Medical expert evidence should be obtained, if
> appropriate.  The issue of whether the claimant can perform her past
> relevant work should be revaluated [*sic*] and the sequential evaluation
> process completed.  Vocational expert should be obtained, if warranted.
>
> The claimant filed a subsequent claim for benefits in March 2004.  The
> Appeals Council's action with respect to the current claim renders the
> subsequent claim duplicate [*sic*].  Therefore, the Administrative Law
> Judge will associate the claim files and issue a new decision on the
> associated claims.
>
> In compliance with the above, the Administrative Law Judge will offer the
> claimant the opportunity for a hearing, take any further action needed to
> complete the administrative record, and issue a new decision.
> (AR 828 -829.)

///

---

[2]  As correctly noted in Claimant's opening brief, Drs. Ayala and Lopez are, in fact, the same person.  Sometime during the course of claimant's medical treatment, Dr. Lopez married and assumed the married name of Lopez -Ayala.

1    A further hearing was conducted by ALJ Berry and, as noted earlier, he issued a written

2    decision on July 5, 2007, again denying Claimant's application for SSI.

3        3.   ALJ's Findings at Latest Remand Hearing

4            A.    Step one finding.   ALJ Berry found that Claimant had not engaged in substantial

5    gainful activity since she filed for SSI on March 17, 1999.  (AR 815).

6            B.    Step two finding.   The ALJ found that Claimant has the severe  impairments of

7    coronary artery disease, degenerative joint disease, and a major depressive disorder.  (AR 815).  The

8    ALJ also found that Claimant has chronic obstructive pulmonary disease ("COPD"), which he found

9    to be only a slight impairment with a minimal effect, if any, on Claimant's ability to work.  (*Id.*).

10   With respect to COPD, the ALJ noted that in March 2002, Claimant complained of shortness of

11   breath when walking more than one-half block or doing laundry,[3] was diagnosed with COPD, was

12   told to stop smoking but nevertheless continued to smoke, and was given  inhalers which were

13   routinely refilled.  (*Id.*).  The ALJ concluded that there is no evidence of  any significant limitation

14   relating to COPD.  (*Id.*).

15           C.    Step three finding.   ALJ Berry found that Claimant's impairments did not meet

16   or medically equal those listed in Appendix 1, Subpart P, Regulation No. 4 of the Social Security

17   Regulations.  (AR 815).  Because the ALJ did not make a disability determination at step three, he

18   determined Claimant's residual functional capacity ("RFC").  The ALJ discussed in detail parts of

19   Claimant's medical and other record evidence, including her testimony.  (AR 816-823).  Based on

20   certain medical records, Claimant's work history, education, and testimony, the latter of which he

21   found not entirely credible, the ALJ concluded that Claimant had the RFC to lift and carry 50 pounds

22   occasionally and 25 pounds frequently and sit, stand and/or walk six hours each in an eight-hour

23   workday, and could perform simple, repetitive tasks, maintain attention, concentration, persistence,

24   and pace, relate to and interact with others, adapt to usual changes in work settings, and adhere to

25   safety rules. (AR 816).

26   ///

27

28        [3]Claimant  testified that her granddaughter does the laundry.

7

      D.   <u>Step four finding</u>.   The ALJ found that Claimant's impairments prevented her from performing her past relevant work as a child monitor and a cashier.  (AR 823).

      E.   <u>Step five finding</u>.   The ALJ determined that Claimant's age, education, work experience, and RFC did not prevent her from holding jobs such as a child care attendant, a kitchen helper, and a hand packer, and concluded, based on the VE's testimony, that there were a significant number of such jobs in the national economy.  (AR 824-825).  Accordingly, ALJ Berry concluded that Claimant  was not disabled, and, therefore, not entitled to SSI benefits.  (AR 824-825).

<b><u>STATEMENT OF EVIDENCE</u></b>

The facts have been presented in the administrative hearing transcripts, the ALJ's decisions, and the briefs filed by Claimant and the Commissioner, and, therefore, only those facts particularly relevant to Court's analysis and conclusion will be set forth here.

    1.  <u>The September 18, 2006 hearing</u>

At the September 18, 2006 hearing, Claimant testified that she was born on August 22, 1950, making her 56 years old on the date of the hearing.  (AR 1092).  She was then 5'3" tall, weighed 200 pounds, and was right-handed.  (AR 1093).  Claimant testified that she graduated high school.  (AR 1092-1093).  Claimant had been separated from her spouse for about eight years.  (AR 1093).   She was living in a trailer home with her 17-year-old grandchild.  (AR 1093, 1116).  Before April 2005, Claimant's other grandchildren also resided with her.  (AR 1093).

Claimant began doing farm work with her father when she was about eight years old.  (AR 1099-1100).  She last worked in 1995, as a cashier at a 7-11 store in Merced for three months.  (AR 1094, 1095, 1100).  At that job, Claimant worked eight hours a day, and described her duties as "a little bit of everything," including running the "cashier," stocking freezers and shelves, mopping and scrubbing floors, cleaning the parking lots, and running the gas station.  (AR 1094).  Claimant lifted items weighing between 20 and 50 pounds several times a day, including cases of beer, milk, and soda.  (AR 1094-1095).  Claimant left the cashier job because her back, chest, and arms hurt.  (AR 1095).  She testified that she had not worked for pay since 1995 or 1996.  (AR 1095.)  Claimant tried to find work as a teacher's aide, but was unable to do so because she failed the "word scramble test." (AR 1099).  Claimant then attempted to get her cashier's job back at the 7-11 store, but was not

8

1   rehired, according to Claimant, because she complained that she could not stock the freezer and

2   scrub the floors anymore.  (*Id.*).

3       Claimant received money other than for her work as a cashier.  She testified that she babysat

4   her grandchildren and also received Aid to Families with Dependent Children ("AFDC") as a

5   grandparent raising her grandchildren in the grandparent's home.  (AR 1096).  She could not recall

6   whether she had babysat for anyone after 1996 or 1997.  (AR 1096).  However, when the ALJ told

7   Claimant that she had previously testified that she babysat in 2001, Claimant recalled "watching my

8   daughter's two kids, yeah" who were not living with her then.  (AR 1097).  Upon further questioning

9   by the ALJ, Claimant acknowledged that she received AFDC for four children in 2000 and 2001.

10  (AR 1097-1099).

11      Claimant testified that she has arthritis in her wrists, elbows, shoulders, knees, ankles, and

12  fingers.  According to Claimant, she has pain "all the time," and takes medication and uses heat

13  packs.  (AR 1100-1102).  Claimant describes her pain level as "about a three to a four" when she

14  takes the medication and "10 or more" without the medication.  (AR 1101).  When asked to describe

15  her pain, Claimant replied that "some of them are sharp, some of them are dull."  (AR 1101).

16  Claimant  has a cane to help her walk, which was given to her by her family physician, Dr. Lopez

17  Ayala.  (AR 1102).  Dr. Lopez Ayala has been Claimant's physician for eight or nine years, treating

18  Claimant for "everything," including arthritis, a heart condition, and high blood pressure.  (AR

19  1102).

20      Claimant further testified that she had heart problems.  (AR 1102).  In early 2000, Claimant

21  underwent triple bypass heart surgery.  (AR 1102-1103).  Claimant reported that she continues to

22  have pain in her chest "every so often" and that it worsens with activity.  (AR 1103-1104).

23  According to Claimant, Dr. Lopez Ayala does not want her to work or to lift more than five pounds.

24  (AR 1104.)  Claimant admitted to smoking cigarettes.  (AR 1104).  When asked how much she

25  smoked, Claimant replied "I'm down to about 15 cigarettes a day" from a previous high of five packs

26  a day.  (*Id.*).  Claimant testified that she was trying to stop smoking.  (AR 1104, 1105).

27      Claimant also testified that she suffers from a pinched nerve between her shoulders and down

28  her lower spine.  (AR 1104).  She describes it as "a constant pain" that when pinched, is "just like a

trillion needles poking me all at once." (AR 1105).  According to Claimant, the pain radiates from her neck down her right arm, which will go numb, and the pain will start going down her left arm if she does not move to release it.  (*Id.*).  Claimant testified that her right shoulder is "constantly hurting."  (*Id.*).  Claimant has not had back, joints, or muscle surgery.  (AR 1116, 1117).

Claimant has asthma, uses inhalers, and continues to smoke cigarettes, although she has tried nicotine patches and medication to stop smoking.  (AR 1105-1106).  According to Claimant, the nicotine patch did not work.  (AR 1106).  She tried another medication to help quit smoking but increased her urge to smoke.  (*Id.*).  Claimant testified that, as a result, Dr. Manuel, her "mental health doctor," told her to stop taking the medication.  (*Id*).

Claimant also takes medication for high blood pressure.  (AR 1105-1106.)  She testified that she takes her medication as directed, except when she cannot afford to buy it.  (AR 1107).   If she fails to take her medication, "it makes [her] chest hurt a lot more than what it does."  (*Id.*)  Claimant also testified to occasional blackouts but that she had not experienced one in a long time. (*Id.*).

Upon examination by her attorney, Claimant testified that she also suffers from depression, fatigue, a lack of concentration and forgetfulness, and interrupted sleep at night.  (AR 1107-1109).  She acknowledged being treated for depression by Dr. Manuel since 2000 or 2001 and said that she has seen a counselor about once a week for the past five or six years.  (AR 1108-1109).  Claimant testified that she is "tired all the time" and that she "forgets things sometimes" . . . "[l]ike when I'm reading a book, or –I forget where I'm at, or  . . . , I forget what I read."  (AR 1109).  She wakes up "sometimes, two, three o'clock in the morning," and will "toss and turn."   After she gets up, Claimant testified that she will "get ... some coffee or a soda pop, sit down ... [and] just ... stare at the walls."  (AR 1109-1110).  Claimant also reported that she has had panic attacks "quite a bit lately," and has been prescribed medication for them.  (AR 1114.)  On the occasions when Claimant attends church services, she sometimes has to leave during the service because she feels "closed in" and otherwise uncomfortable around a lot of people.  (AR 1113, 1114).

Claimant does not eat breakfast or lunch.  (AR 1110).  As for household chores, Claimant's granddaughter does all the cleaning, laundry, dishes, and most of the cooking.  (AR 1110-1111).  Claimant  helps with the cooking when she can put something in the microwave.  (AR 1111).

Claimant takes showers with no problems except for occasional trouble washing her hair – her "arms go numb when I've got them up over my head." (AR 1110). Claimant has a driver's license and can drive but she does not have a car. (AR 1111). She goes shopping "about once a month" when her friend provides transportation. (*Id.*).

Claimant also testified that she can walk "about a block" but has to stop and either sit or lay down because her legs "go numb" and her lower spine "starts hurting." (AR 1112). She reported that her legs constantly go numb when she sits straight in a chair, and she is not supposed to bend because it puts pressure on her lower spine. (AR 1112, 1113). According to Claimant, her chest and right arm hurt if she lifts more than five pounds. (AR 1113).

Upon further examination by the ALJ, Claimant testified that she was able to stand for one hour and to sit for one and one-half hours in an eight-hour day. (AR 1114). When asked what she did during the remaining six and one-half hours, Claimant replied that she lays down or sits in a recliner chair. (*Id.*).

   2. The November 15, 2006 hearing

On November 15, 2006, Dr. Karbelnig testified as a consulting medical expert. Upon examination by the ALJ, Dr. Karbelnig stated that he was a fellow of the American College of Surgeons and a board-certified orthopedic surgeon. (AR 1123). Dr. Karbelnig reviewed Claimant's medical records and opined as to her past and current orthopedic conditions. Dr. Karbelnig testified that Claimant was diagnosed as suffering from degenerative disc disease of the lunar spine, coronary artery disease, depression, and arthritis. (AR 1125, 1128). As to the degenerative disc disease, Dr. Karbelnig testified that an MRI study showed mild disc bulges with no evidence of nerve root encroachment, and that in his opinion, Claimant's condition is normal for a person over the age of 30 and is not a severe impairment. (AR 1125-1126). When asked whether there are any limitations attached to Claimant's physical functioning, Dr. Karbelnig referred to a May 1998 RFC assessment showing shifting and carrying 50/25, standing and sitting six hours per day, for an eight-hour day and unlimited push and pull, and opined that such an RFC "would be, in my opinion, pretty characteristic" of Claimant's file. (AR 1126). Dr. Karbelnig also testified that, over the period of time between May of 1998 and the date of the hearing, there had probably been some further

1   progression of degenerative disc disease but it would be nothing that he would find resulted in

2   impairments that were disabling.  (AR 1127).

3        When asked about Claimant's arthritis, Dr. Karbelnig testified that he saw no x-ray evidence

4   or any other evidence corroborating severe arthritis, and in his opinion, there was nothing disabling

5   or that would interfere with normal ability, that based on his review, he was "not able to say that

6   there is any limitation in [Claimant's] abilities of that kind."  (AR 1129-1131).

7        After the close of Dr. Karbelnig's testimony, the ALJ noted it would be necessary to obtain a

8   medical expert opinion regarding the psychiatric issues involved in adjudicating the claim.

9   Claimant's counsel agreed to the use of written interrogatories.  (AR 1140).

10       3.   The June 26, 2007 hearing

11       At the continued hearing on June 26, 2007, the ALJ considered a written report of Dr.

12  Charles F. Agler dated January 7, 2007.  Dr. Agler was the medical expert to whom interrogatories

13  had been propounded after the close of the previous hearing.  At the hearing and in response to the

14  ALJ's invitation (AR 1080), Claimant's counsel objected to certain information contained in the

15  report that Claimant found confusing or untrue.  (AR 1080-1081).  Having heard the arguments of

16  counsel, the ALJ admitted Dr. Agler's report into evidence.  (AR 1081; AR 1061-1072).

17       Dr. Agler's report disclosed a review of what appears to be all of Claimant's medical records.

18  Dr. Agler noted a lack of any recent psychiatric evaluations of Claimant.  (AR 1061).  Dr. Agler

19  noted that:

20       "[f]rom a psychiatric standpoint there are some reasonable early
         interventions.  The issue of a personality disorder was raised.  However,
21       there has never been any psychological testing which might more clearly
         elucidate this issue.  Early progress notes are strongly supportive evidence
22       for a major personality disorder.  The parameters of such a disorder are not
         clear on a single psychiatric evaluation. ... [¶]  [Claimant] has consistently
23       been described as depressed, but virtually all evaluations give a GAF[4] of

24

25       [4]  "GAF" stands for "Global Assessment of Functioning," a scale that measures an individual's overall
    psychological functioning.  The term is defined and used in the *Diagnostic and Statistical Manual of Mental Disorders*.
26  Users of the assessment tool are instructed to consider psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness and to not include impairment in functioning due to physical limitations.
    A score in the 51-60 range is described as "moderate symptoms ... OR moderate difficulty in social, occupational, or
27  school functioning."  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, (2000), p.
    34.  A higher score on the scale (i.e., above 60) describes mildly symptomatic to superior psychological functioning
28  levels.

55 or higher.  This is inconsistent with meeting a psychiatric condition, but may allow for equaling.  Careful review of the social or progress notes over the entire period from 1994 until the present does not suggest any worsening of the condition, but rather [a] highly static condition. ... [¶] The applicant exhibits a pattern of frequent absenteeism throughout her mental health and general medical contacts.  She also exhibits an excessive pattern of contact with general medical personnel approaching an almost weekly frequency.  This is consistent with earlier opinions about personality disorder and/or manipulativeness."  (AR 1062).

When asked to list the claimant's mental impairments, if any, resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques, Dr. Agler responded:

The applicant claims a loss of interest in activities, loss of appetite (in spite of weight gain), extremely poor sleep, feelings of guilt and hopelessness, trouble with memory, and a past history of suicidal ideation. [¶] She has been described by others as being overly demanding, impatient, possibly distorting the truth, overly dramatic, highly focused on her own needs and wants and resistant to redirection, and at times not fully cooperative with treatment.  (AR 1062-1063).

Dr. Agler also noted that there was evidence that Claimant had not properly complied with the prescribed treatment, including her frequent absenteeism and "at least in the past some level of less than optimal cooperation."  (AR 1066).

Dr. Agler concluded that none of the foregoing impairments were severe as defined in relevant provisions of Social Security law.  (AR 1063).  Dr. Agler stated:

I cannot claim any impairment is severe because of the limited recent evaluations and patient's overt attempts to present a picture of severity.  I have some suspicion that a Personality Disorder may be present.  I do not believe her depression is severe, and this is based on seemingly appropriate psychiatric evaluations of June 9, 1999, Exhibit 11 F, and April 23, 1998 Exhibit 5 F. ... Generally the presence of a personality disorder is not sufficient to be a meeting criteria.  However  in some cases in which the condition is extremely severe and rigid in nature [*sic*] it might meet [*sic*].  (AR 1063).

Dr. Agler repeated that his opinion as to the lack of severity of Claimant's mental impairment "applies only to [Claimant's] mental ability" and "is provisional as there is inadequate documentation." (AR 1065).

At this hearing, the ALJ also heard limited testimony from Claimant and VE Najarian.  Claimant testified that she had not worked in  the last seven to eight years.  (AR 1082-1083).  The

13

ALJ asked the VE two hypothetical questions.  In his first question, the ALJ asked her to assume an individual 56 years of age with a 12th grade education, past relevant work experience as a cashier/clerk and a child monitor, with a combination of severe impairments, and the RFC to lift and carry 50 pounds occasionally, 25 pounds frequently, and the ability to stand, walk, and sit six hours each day, and the ability to perform simple, repetitive tasks, as well as maintain attention, concentration, and pace.   The ALJ asked the VE to further assume that the individual retains the ability to relate to and interact with others, the ability to adapt to usual changes in work setting, and the ability to adhere to safety rules.   With the foregoing in mind, the ALJ asked the VE whether such an individual could perform any of Claimant's past relevant work.  (AR 1084).  Ms. Najarian testified that such an individual could not.  The ALJ then asked the vocational expert if such an individual could perform any other jobs which exist in the national economy.  The VE replied that the individual could perform the full range of unskilled medium, light, and sedentary work, such as child care attendant, kitchen helper, and hand packer.  (AR 1084-1085).  Ms. Najarian testified that for a childcare attendant, the job figures were 26,554 in California; nationally, it would be nine times that amount.  (AR 1085).  She also testified that other examples were "kitchen helper ..., 19, 5992 [, and] hand packer ... 16,006." (*Id.*).

In his second hypothetical question, the ALJ asked VE Najarian to assume an individual with the same vocational parameters in the first question, also with a combination of severe impairments, and the residual functional capacity to stand one hour, walk approximately one block, and sit 90 minutes, with the ability to lift a maximum of five pounds, who has difficulty maintaining concentration and recall, and difficulty  interacting and relating to others, including the general public.  The ALJ asked the vocational expert whether, given those limitations, such an individual could perform either of Claimant's past relevant jobs.  (AR 1086).  Ms. Najarian replied that the individual could not, nor could he or she perform any other jobs that exist in the national economy. (*Id.*).

Claimant's counsel also presented a hypothetical question to Ms. Najarian.  He asked her to assume the same limitations as in the first hypothetical, with the additional limitations that the individual uses a cane, is incapable of low-stress type of work, needs to take unscheduled breaks

every 10 to 15 minutes during an eight-hour day,  has to shift positions at will from sitting, standing, or walking, has a 30%  use of his or her right hand, fingers and arms for reaching, fine manipulation, and grasping, and has no use of them on the left.  (AR 1086-1087).  Claimant's attorney asked the VE whether, given those limitations, such an individual would be able to do either the past relevant work or any other work.  Ms. Najarian replied that such an individual cannot do past relevant work or any other work.  (AR 1086 -1087).

> 4.   Supplemental Medical Records of Claimant's Treating Physicians

Since the date of the Appeals Council's remand order, Claimant's treating family practitioner, Dr. Lopez Ayala, and Claimant's treating psychiatrist, Dr. Isabel Manuel, submitted written opinions (AR 1023-1026, 1031- 1036) and medical case records regarding the status and impacts of various impairments for which they each treated Claimant more recently.   Among other information, in July 2006, Dr. Lopez Ayala completed a Cardiac Residual Functioning Questionnaire as to Claimant.  (AR 1023-1026).  In that report, Dr. Lopez Ayala stated that Claimant had been her patient for eight years and that she saw Claimant every one to three months for coronary artery disease, osteoarthritis, and asthma.  (AR 1023).  She also reported that she relied on certain clinical findings, laboratory reports and test results identifying Claimant's cardiac condition.  (*Id.*). Dr. Lopez Ayala described Claimant's functional capacity limitations as unable to sit for more than 10 minutes at a time before needing to get up; that Claimant needed to be able to change positions at will; that Claimant would sometimes need to take unscheduled breaks during an eight-hour workday as often as every 10 to 15 minutes, with each rest period lasting 10 to 15 minutes; that Claimant could rarely lift and carry less than 10 pounds or less in a competitive work situation, and could never carry more than 20 pounds; that Claimant could occasionally twist and bend for work activities, rarely crouch or climb stairs, and never climb ladders; that Claimant should avoid all exposure to fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights; that Claimant did not need to avoid noise or wetness in the work area; that Claimant should avoid even moderate exposure to extreme cold or heat; and that Claimant should avoid concentrated exposure to humidity.  (AR 1024-1026).  Dr. Lopez Ayala opined that Claimant's cardiac-related impairments were not likely to produce "good days" and "bad days" (AR 1026) and that her

1   prognosis was poor (AR 1025).

2       In June of 2006, Dr. Isabel Manuel also submitted medical opinion evidence about the

3   impacts of Claimant's depression on Claimant's ability to perform work-related activities.

4   Dr. Manuel's opinion is set forth in a completed Mental Impairment Questionnaire (RFC &

5   Listings).  (AR 1031-1036).  Dr. Manuel provided Claimant's diagnosis, prognosis, disability onset

6   date, estimated duration, and a lengthy description of Claimant's symptoms.   Dr. Manuel also

7   submitted a completed Medical Source Statement of the Nature and Severity of an Individual's

8   Mental Impairment.  (*Id.*).  Overall, Dr. Manuel's clinical assessments described global and moderate

9   to marked limitations in Claimant's ability to perform work-related activities as a result of the

10  impacts of Claimant's mental health problems.  (*Id.*).

11                          **RELEVANT LEGAL FRAMEWORK**

12      To qualify as disabled under Title XVI of the Act, an applicant for SSI benefits must be

13  "unable to engage in any substantial gainful activity by reason of any medically determinable

14  physical or mental impairment which can be expected to result in death or which has lasted or can be

15  expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

16  The Act also provides that a claimant shall be determined to be under a disability only if his

17  impairments are of such severity that he "is not only unable to do his previous work but cannot,

18  considering his age, education, and work experience, engage in any other substantial gainful work

19  which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

20      The Commissioner has established a five-step sequential evaluation process for determining

21  whether a person is disabled under Title XVI of the Act.  20 C.F.R. § 416.920.  Step one determines

22  whether the claimant is engaged in substantial gainful activities.  If he is, benefits are denied.

23  20 C.F.R. § 416.920(a)(4)(i), (b).  If he is not, the decision maker proceeds to step two, which

24  determines whether the claimant has a medically severe impairment or combination of impairments

25  that meet the duration requirements set forth in 20 C.F.R. § 416.909; i.e., the impairment(s) are

26  expected to result in death, or have continuously lasted or are expected to last at least twelve months.

27  20 C.F.R. § 416.920(a)(4)(ii), (c).  If the claimant does not have a severe impairment, a combination

28  of impairments, or meet the duration requirement, the disability claim is denied.  *Id.*

1   If the impairment is severe, the evaluation proceeds to the third step, which compares the

2   claimant's impairment with a number of listed impairments acknowledged by the Commissioner to

3   be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 416.920(a)(4)(iii), (d);  20

4   C.F.R. Pt. 404 Subpt. P App. 1.  If the impairment meets or equals one of the listed impairments and

5   satisfies the duration requirement, the claimant is conclusively presumed to be disabled.

6   20 C.F.R. §§ 416.909, 416.920(a)(4)(iii), (d).  If the impairment is not one conclusively presumed to

7   be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment

8   prevents the claimant from doing work performed in the past.  If the claimant is able to perform his

9   previous work, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(iv), (e); 416.960(b).  If the claimant

10  cannot perform this work, the fifth and final step in the process determines whether he is able to

11  perform other work in the national economy in view of his age, education and work experience.  20

12  C.F.R. §§ 416.920(a)(4)(v), (f) and (g); 416.960(b) and (c).  *See Bowen v. Yuckert*, 482 U.S. 137, 107

13  S. Ct. 2287 (1987).

14   The initial burden of proof rests upon a claimant to establish that he "is entitled to the

15  benefits claimed under the Act."  *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations

16  omitted).  In terms of the five step sequential evaluation process, the Ninth Circuit has held that

17  "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that

18  an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of

19  burdens" such that "the ALJ shares the burden at each step."  *Tackett v. Apfel*, 180 F.3d 1094, 1098

20  & n.3 (9th Cir. 1999)(italics in original).  The initial burden is met once a claimant establishes that a

21  physical or mental impairment prevents him from engaging in his previous occupation.  The burden

22  then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful

23  activity and (2) that a "significant number of jobs exist in the national economy" which claimant can

24  perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

25   **STANDARD OF REVIEW**

26   Congress has provided a limited scope of judicial review of a Commissioner's decision.  <u>See</u>

27  42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when

28  it is supported by substantial evidence and is free from legal error.  *See Ukolov v. Barnhart*, 420 F.3d

17

1    1002, 1004 (9th Cir. 2005)(quotations and citations omitted); *Jones v. Heckler*, 760 F.2d 993, 995

2    (9th Cir. 1985); 42 U.S.C. § 405(g).  Substantial evidence is more than a mere scintilla, *Sorenson v.*

3    *Weinberger,* 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance.  *McAllister v.*

4    *Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and Human Serv.*,

5    846 F.2d 573, 576 (9th Cir. 1988).  Substantial evidence "means such evidence as a reasonable mind

6    might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91

7    S. Ct. 1420 (1971) (citations omitted).  "[S]uch inferences and conclusions as the [Commissioner]

8    may reasonably draw from the evidence" will also be upheld.  *Mark v. Celebrezze*, 348 F.2d 289, 293

9    (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence

10   supporting the decision of the Commissioner.  *Weetman v. Sullivan,* 877 F.2d 20, 22 (9th Cir. 1989)

11   (citations omitted); *see Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (summarizing standard of

12   review in Social Security cases).

13          It is the role of the trier of fact, not the court, to resolve conflicts in evidence.  *Richardson,*

14   402 U.S. at 400.  If the evidence supports more than one rational interpretation, the court must

15   uphold the decision of the ALJ.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  If there is

16   substantial evidence to support the administrative findings, or if there is conflicting evidence that

17   would support a finding of either disability or non-disability, the Commissioner's decision is

18   conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  Nevertheless, a decision

19   supported by substantial evidence will be set aside if the proper legal standards were not applied in

20   weighing the evidence and making the decision.  *Brawner v. Secretary of Health and Human Serv.*,

21   839 F.2d 432, 433 (9th Cir. 1987).

22                                           **ISSUES**

23          Claimant contends that the Commissioner erred because ALJ Berry committed the following

24   two errors:

25          1.  The ALJ erroneously evaluated the opinions of Claimant's treating physicians and medical

26   experts; and

27          2.  The ALJ erroneously weighed the vocational expert's testimony.

28   ///

1    As discussed *supra*, this Court must uphold the Commissioner's determination that a

2    claimant is not disabled unless it contains legal error or is not supported by substantial evidence in

3    the record as a whole.  *Orn*, 495 F.3d at p. 630.

4                                    **DISCUSSION**

5    A.    The ALJ's Treatment of Medical Opinion Evidence

6          1.    Compliance with Remand Order

7    The Court has read the "Order of Appeals Council Remanding Case to the Administrative

8    Law Judge" dated March 20, 2006 decision and compared it with ALJ Berry's earlier ruling for

9    compliance with the Appeals Council's order.  The Court can find little, if any, evidence in the

10   second ALJ Berry ruling showing that the ALJ gave further consideration to the medical source

11   opinions of Dr. Lopez Ayala and/or Dr. Cahill.  Despite the Appeals Council's warning in its March

12   20, 2006 order that the rationale provided for rejecting Dr. Lopez Ayala's opinion was insufficient,

13   and that further consideration and discussion of that opinion had to be provided, this Court can find

14   little evidence of any such effort[5] and no evidence of change in the ALJ's rationale for not accepting

15   Dr. Lopez Ayala's opinion.

16   The status and impacts of Claimant's heart disease and breathing problems were matters

17   warranting further consideration at the subsequent hearing, according to the Appeals Council.

18   Indeed, the Appeals Council instructed the ALJ to obtain and consider Dr. Fuh's[6] complete

19   November 2005 report and any appropriate medical experts necessary to evaluate the impacts of

20   Claimant's medically determinable impairments on her ability to work.  While there is evidence in

21   this record that the ALJ obtained Dr. Fuh's complete report (AR 969-970), there is no evidence in

22   the second ALJ Berry ruling of any further consideration of that report; no evidence of retention of a

---

23          [5]  The full extent of further attention to Dr. Lopez Ayala's opinion by the ALJ was: "In response to Dr. Agler's

24   report [a non-examining, non-treating medical expert in the field of psychiatry who rendered an opinion on the impact of
     Claimant's depressive disorder on her ability to perform work-related tasks], Dr. Ayala  reiterated her opinion that the

25   claimant is unable to work, and noted that Dr. Agler did not examine the claimant (Exhibit 39F). ... However, I have
     given [this] opinion less weight than typically would be warranted, as [it] reinforce[s] the consistent impression that

26   claimant will do whatever she needs to do to maintain a source of cash and a place to live." (AR 823.)  The ALJ
     continued to reject Dr. Lopez Ayala's opinion based on what the ALJ saw as the treating physician's misplaced reliance

27   on Claimant's reports of symptoms.  That rationale for rejection was insufficient, according to the Appeals Council.

28          [6]Claimant's treating cardiologist at the time.

1  cardiac or pulmonary medical expert to assist the ALJ in evaluating the impacts of coronary and/or

2  pulmonary disease; and no further discussion of these issues in the second ALJ Berry ruling.

3        The ALJ's failure to comply with the remand orders is error under the provisions of the

4  Social Security Administration's regulatory framework.  The assurances and procedures for

5  adjudication of SSI claims are set forth in the Code of Federal Regulations.  The Appeals Council

6  may remand a case to an administrative law judge to hold a hearing and issue a decision; it may also

7  remand because additional evidence is needed or additional action by the administrative law judge is

8  required.  20 C.F.R. § 416.1477(a).  "The administrative law judge shall take any action that is

9  ordered by the Appeals Council and may take any additional action that is not inconsistent with the

10  Appeals Council's remand order."  20 CFR 416.1477(b).  "When a Federal court remands a case to

11  the Commissioner for further consideration, the Appeals Council, acting on behalf of the

12  Commissioner, may make a decision, or it may remand the case to an administrative law judge with

13  instructions to take action and issue a decision or return the case to the Appeals Council with a

14  recommended decision.  If the case is remanded by the Appeals Council, the procedures explained in

15  §416.1477 will be followed. ..."  20 CFR §416.1483.

16        2.   Materiality of Failure to Comply with Remand Order

17        Based upon the record before it, the Court cannot find that this error was immaterial.  The

18  ALJ's failure to explore Claimant's heart disease more fully is problematic. The ALJ found that

19  Claimant's coronary artery disease was a severe medical impairment, along with her degenerative

20  joint disease and major depressive disorder.  (AR 815).  Once sufficiently severe limiting

21  impairments are found to exist, all of those medically determinable impairments must be considered

22  in the remaining steps of the sequential analysis.  *Orn*, 459 F.3d at p. 630; *Celaya v. Halter*, 332 F.3d

23  1177, 1181-1182 (9th Cir. 2003).  These impairments "must  be considered in combination and must

24  not be fragmentized in evaluating their effects. In determining whether the claimant's *combination of*

25  *impairments equals* a particular listing, the Commissioner must consider whether his symptoms,

26  signs, and laboratory findings are at least equal in severity to the listed criteria (internal citations and

27  quotations omitted) (emphasis added)." *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1996).

28  ///

20

1    Further, in arriving at such conclusions, the ALJ needs a reasonably well-developed case

2  record.   Section 416.913(e) of the Code of Federal Regulations, Title 20, instructs that the evidence

3  in the case record, including the medical evidence from acceptable medical sources and other

4  medical sources, information that Claimant provided  about her medical condition and how it

5  affected her, and other evidence from other sources, was required to be complete and detailed

6  enough to allow the ALJ to make a determination or decision about whether Claimant was disabled.

7  *See* 20 C.F.R. § 416.913(e).  Complete evidence enables the decision-maker to determine: (1) The

8  nature and severity of the claimant's impairment or impairments for the period in question; (2)

9  whether the duration requirement was met; and (3) the claimant's residual functional capacity to do

10  work-related physical and mental activities.  (*Id.*)

11    Here, the ALJ found the combination of Claimant's severe impairments –  coronary artery

12  disease, degenerative joint disease, and major depressive disorder – did not meet or medically equal

13  one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I.  AR 815.  However, the

14  evidence in the record relating to Claimant's coronary artery disease was insufficient to allow the

15  ALJ to make an informed decision about Claimant's disability.

16    Since the date of onset of Claimant's alleged disability, all of the information regarding

17  Claimant's heart problems comes from four physicians – an unidentifiable State Agency physician,

18  Dr. Ayala Lopez, Dr. Fuh, and Dr. Cahill.  All four were licensed medical doctors; Drs. Ayala Lopez

19  and Fuh were treating doctors; the State Agency physician and Dr. Cahill were examining doctors.

20    A  review of the record relating to Claimant's coronary artery disease discloses the following

21  information.  In early February 1999, Claimant suffered a heart attack.  (AR 308, 300-305).  This

22  cardiac event was documented by diagnostic testing.  (AR 308).  Claimant had physicians, Dr. Lopez

23  Ayala and Dr. Fuh, involved in her cardiac care, at least on an ongoing basis, after the February 1999

24  cardiac event.  Dr. Fuh appears to have became the consulting cardiologist to Dr. Lopez Ayala

25  regarding Claimant's cardiac status beginning in February 1999.

26    In May 1999, at the request of the state disability evaluation analyst (AR 355-359),

27  Dr.Chahil, a board certified family practitioner, conducted an examination of Claimant, including a

28  review of medical records.  Dr. Cahill was aware that Claimant's heart problems formed one of the

21

1  bases for her claim of disability.  Dr. Cahill physically examined Claimant and concluded that the

2  claimant should have been able to perform physical activity involving sitting, standing, and/or

3  walking with breaks every two hours during an eight-hour work shift.  Dr. Cahill opined that

4  Claimant should have been able to lift 25 pounds occasionally.  He found no limitations with

5  bending, stooping, crouching, crawling, gross manipulations of the hands, and with fine

6  manipulations of the fingers.  (AR 358).   The state agency physician examined Claimant in June

7  2009.  Coronary artery disease was the primary diagnosis, and the physician determined that

8  "[c]ardiac findings following M.I. have been normal.  No objective evidence to restrict to no further

9  work after 12 months."  (AR 370).   The state agency physician concluded that Claimant could lift

10  and carry 25 pounds occasionally and 10 pounds frequently and that there were no postural, visual,

11  manipulative, communicative or environmental limitations present.  (AR 365-368).

12        Approximately seven months later, in February of 2000, Dr. Fuh conducted a left ventricular

13  angiography of Claimant's heart, the results of which showed mild left ventricular dysfunction and

14  triple vessel coronary artery disease.  (AR 433-435).  He concluded Claimant was a candidate for

15  myocardial revascularization surgery and referred her to a surgeon for further treatment.  A copy of

16  Dr. Fuh's report was sent to Dr. Lopez Ayala, as the referral physician.  (AR 435).  In March 2000,

17  Claimant underwent coronary artery bypass surgery involving grafting of three blood vessels.  (AR

18  389-392).  The surgeon diagnosed Claimant, post surgery, with unstable angina and three vessel

19  coronary artery disease.

20        After Claimant's heart problems were diagnosed in February 1999, she was treated by both

21  Dr. Lopez Ayala and Dr. Fuh with medication for those problems.  (AR 158, 161, 969, 990, 1024).

22  Both continued to periodically examine Claimant.  There are medical records showing that Dr. Lopez

23  Ayala continued to treat Claimant's cardiac condition as late as July 2006.  Additionally, charting

24  entries in Dr. Lopez Ayala's records report that Dr. Fuh continued to monitor Claimant's heart

25  condition through examination as late as November 2005 and that he continued to treat Claimant for

26  that condition through medication, i.e., Lipitor.  (AR 990.)

27        In November 2000, Dr. Fuh prepared a written report addressed to Dr. Lopez Ayala regarding

28  Claimant's cardiac status.  Dr. Fuh had conducted a physical examination of Claimant and reported

his findings to Dr. Lopez Ayala, i.e., severe coronary artery disease, status post coronary artery bypass graft; chest wall pain; leg cramps; noncompliance [continued smoking]."  (AR 969-970.)  Dr. Fuh did not discuss or render any opinion regarding functional capacity limitations Claimant's cardiac status might impose or give any prognosis with regard to Claimant's cardiac condition. In July 2006, Dr. Lopez Ayala completed the Cardiac Residual Functioning Questionnaire discussed *supra*.

The ALJ's ruling does not specifically address any limitations that Claimant's *cardiac* condition might have imposed on her ability to perform work-related activities.  In the portion of his ruling where the ALJ concludes Claimant did not have a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ says only this about Claimant's physical impairments: "The impairments listed in Appendix 1, Subpart P, CFR Part 404, which are most nearly applicable to the claimant's physical medically determinable impairments, particularly Sections 1.02 and 4.04C, have been reviewed and are not met or medically equaled under the facts of this case." (AR 815-816.)  The ALJ's ruling does not mention Dr. Lopez Ayala's July 2006 cardiac residual functional capacity opinion or discussion. The ALJ merely repeats all of the information in his earlier order with respect to Dr. Cahill and the exertional and postural limitations found by the state agency physician, and neglects to discuss the impact of Claimant's subsequent catheterization results and coronary bypass surgery on Dr. Cahill's or the state agency's conclusions.

Dr. Fuh is the only physician other than Dr. Lopez Ayala who treated Claimant's cardiac problems.  There is no information in the record about what Dr. Fuh may have concluded about the impacts of Claimant's coronary artery disease on her ability to perform various work-related activities, including exertional limitations, if any.[7]  Nor is there any information about how Claimant's cardiac disease might be impacted by Claimant's major depressive disorder and whether some combination of these impairments might, or might not,  produce a level of severity "equal to"

---

[7]  Dr. Fuh's November 2000 report contained findings but no opinions based on those findings.  Given the lack of medical expert opinion interpreting those findings, they appear to be of little value here.  (*Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

1   one of the listed impairments.

2       The Appeals Council appears to have recognized this potential problem.  Not only did it

3   instruct the ALJ to obtain Dr. Fuh's complete report, consider it more fully, and further address the

4   claimant's heart condition, the Appeals Council told the ALJ to get medical expert opinion on

5   Claimant's alleged impairments, if appropriate.   The case record at the time of hearing on the second

6   remand contained objective evidence that additional medical evidence was necessary in order to

7   assess the limiting impacts of Claimant's cardiac disease properly.[8]  "In Social Security cases the

8   ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests

9   are considered. *Thompson v. Schweiker*, 665 F.2d 936, 941 (9th Cir. 1982).  This duty exists even

10  when the claimant is represented by counsel. *See Driggins v. Harris*, 657 F.2d 187, 188 (8th

11  Cir.1981)."  *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 9183); *see also, DeLorme v. Sullivan*,

12  924 F.2d 841, 849 (9th Cir. 1991).

13      The ALJ's failure to obtain the necessary medical information was error.  The ALJ's failure

14  to more fully explain his rationale for essentially rejecting the opinions of Claimant's treating

15  physicians was also error, particularly with respect to how those medical opinions impacted the

16  ALJ's determination of disability relating to the severe medical impairments resulting from

17  Claimant's cardiac disease.  These were orders contained in the Appeals Council's remand decision,

18  and were necessary actions to secure substantive compliance with that decision.  The failure to

19  substantially comply with the Appeals Council's remand order was not harmless error.

20      3.   <u>The ALJ Improperly Rejected the Treating Physicians' Opinions</u>

21      Claimant contends that the ALJ improperly rejected the opinions of Claimant's treating

22  physicians.  The Commissioner asserts in part, that the ALJ properly rejected Dr. Lopez Ayala's

23  ───────────────────

24     [8] Dr. Charles Agler, whose opinions about the work-related activities limitations imposed by
    Claimant's depression were heavily relied upon by the ALJ, observed that "[t]here is lack [*sic*] of

25  recent evaluations in Psychiatry, Internal Medicine (or preferably Orthopedic, Pulmonary, and
    Cardiac Medicine) [*sic*].  In view of the fact that an issue of equaling a listing is in order, it is

26  important to have current medical information."  (AR 1061.)  Dr. Agler was a licensed medical
    doctor in the field of psychiatric medicine.  In this matter, Dr. Agler served as a non-treating, non-

27  examining medical expert on Claimant's mental health impairment issues.  He acknowledged that he

28  was not reporting as a general medical expert, but as a psychiatrist.  (*Id.*)

1   opinions regarding Claimant's disability status because disability status is an issue reserved for the

2   Commissioner.

3          While it is true that medical source opinions on issues reserved to the Commissioner, such as

4   the conclusion about whether the claimant is disabled, are not determinative or entitled to special

5   weight based on the source of the medical opinion, it is not true that the Commissioner is free to

6   disregard that information.  Title 20 C.F.R. § 416.927(e) provides, in pertinent part, that medical

7   source opinions on issues reserved to the Commissioner (e.g., whether the claimant is disabled,

8   whether claimant's impairments meet or equal a listing, claimant's residual functional capacity, or

9   application of vocational factors) are not medical opinions, and no special significance will be given

10  to the source of the opinion on these issues.  (*Id.*)  However, § 416.927(e) also provides that, in

11  determining the ultimate issue of disability, the Commissioner will review all of the medical findings

12  and other evidence that support a medical source's statement that the claimant is disabled and that

13  the Commissioner will use medical sources, including claimant's treating source, to provide

14  evidence, including opinions, on the nature and severity of claimant's impairments.  (*Id.*)  Similarly,

15  the Commissioner is not free to disregard opinions from medical sources on other dispositive issues;

16  the Commissioner must also consider opinions from medical sources on issues such as whether

17  claimant's impairments meet or equal the requirements of any impairments in the Listing, what

18  claimant's residual functional capacity might be, and the application of vocational factors.  (*Id.*)

19          (a)    Treating Physicians

20          As mentioned earlier, the crucial physicians involved here are Dr. Cahill, an unidentified

21  state agency physician, Dr. Fuh, Dr. Lopez Ayala, and Dr. Manuel.  Dr. Cahill and the unnamed State

22  Agency doctor were both retained to evaluate Claimant's initial claim of disability in 1999.  Both

23  examined Claimant, apparently only once, as part of their separate evaluations.  Both identified

24  coronary artery disease as at least one of the bases for the disability claim.  Their conclusions

25  differed as to Claimant's physical exertional capacities but both concluded that Claimant retained the

26  ability to perform work-related activities at a light or medium level.

27          Dr. Fuh and Dr. Lopez Ayala were Claimant's treating physicians during the period in

28  question (1998 to 2004).  Dr. Fuh treated Claimant on cardiac issues and also acted as a consultant to

1   Dr. Lopez Ayala on those issues.  Dr. Lopez Ayala was Claimant's family practitioner, treating her

2   for a number of medical problems, including coronary artery disease, asthma and other respiratory

3   problems, degenerative joint disease, and osteoarthritis.   Dr. Manuel had also treated Claimant for

4   mental health conditions for several years during the period of claimed disability.  (AR 899-901.)

5       (b)    Standards

6       The opinions of treating physicians should be given more weight than the opinions of

7   physicians who do not treat the claimant.  *Reddick v. Chater*, 157 F. 3d 715, 725 (9th Cir. 1998);

8   *Lester,* 81 F. 3d at 830.  In Lester, the Ninth Circuit instructs that:

> Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions.  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.
>
> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician.  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. (Citations and footnotes omitted.)  *Lester*, 81 F.3d at p. 830.

21      An ALJ may reject a treating or examining physician's opinion, even if contradicted by

22  another physician, only if he or she provides specific, legitimate reasons based on substantial

23  evidence in the record.  *Lester*, 81 F.3d at pp. 830-831; *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th

24  Cir. 1995); *Magallanes v. Brown*, 881 F.2d 747, 751-755 (9th Cir. 1989).  In *Embrey v. Bowen*, 849

25  F. 2d 418 (9th Cir. 1988), the Ninth Circuit explained that:

> [T]he medical opinions of a claimant's treating physicians are entitled to special weight and ... if the ALJ chooses to disregard them, he must set forth specific, legitimate reasons for doing so .... The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and

conflicting evidence, stating his interpretation thereof, and making findings. ... [¶] To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity ... required, even when the objective factors are listed seriatim.  The ALJ must do more than an offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.  Moreover the ALJ's analysis [must give] proper weight to the subjective elements of the doctors' diagnoses.  The subjective judgments of treating physicians are important, and properly play a part in their medical evaluations. " *Embrey*, 849 F.2d at 421-422.

*See also, Magallanes*, 881 F.2d at p. 751.

In *Orn v. Astrue*, the Ninth Circuit expounded upon its position regarding an ALJ's

acceptance of the opinion of an examining physician over the opinion of a treating physician.

When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence." . . . *(*Citation omitted.)  By contrast, when an examining physician provides independent clinical findings that differ from the findings of the treating physician, such findings are 'substantial evidence.' (Citations omitted.)  Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and are supported by the evidence . . .or (2) findings based on objective medical tests that the treating physician has not herself considered. (Citations omitted).

(c)    Opinions regarding Claimant's cardiac health

Here, Claimant's cardiac disease was diagnosed by treating physicians Drs. Lopez Ayala and

Fuh, who considered objective medical evidence in making their diagnoses.  Claimant's cardiac

problems resulted in diagnosed myocardial infarctions, involved the significant occlusion of three

vessels in her left ventricle according to an angiography performed in early 2000, and required a

subsequent coronary artery bypass surgery involved grafts of these three vessels.  Management of

Claimant's coronary artery disease throughout this period was managed clinically through

monitoring and medication, by both treating physicians.

As late as July 2006, Dr. Lopez Ayala identified the clinical findings, laboratory and test

results showing this cardiac impairment as two prior myocardial infarctions and the coronary bypass

surgery.  (AR 1023).  She described Claimant's symptoms as chest pain/anginal pain, shortness of

breath, fatigue, and occasional weakness and reported that Claimant's anginal ache radiated to her

left shoulder and lower left arm.  Dizziness and nausea were also described as features of this anginal

1   pain, which was severe in degree.  (*Id.*)  Dr. Lopez Ayala noted that Claimant had marked limitation

2   of physical activity even though Claimant was comfortable at rest.  (*Id.*)  According to Dr. Lopez

3   Ayala, Claimant's cardiac disease was exacerbated by stress; that Claimant was incapable of even

4   "low stress" jobs, referencing Claimant's mental health impairments and explaining that Claimant's

5   chronic pain resulting from the cardiac issues makes Claimant's depression worse.  (*Id.*)  Dr. Lopez

6   Ayala listed a variety of medication Claimant was prescribed to manage her coronary artery disease

7   and those other conditions that affected the severity of that disease and advised that the potential side

8   effects of those medications included drowsiness and decreased concentration, both of which could

9   have implications for working.  (*Id.*)

10      In early 1999, Dr. Cahill and the unidentified State Agency doctor also examined Claimant

11  for disability related to her cardiac impairment.  Neither was a treating physician and neither

12  apparently examined Claimant more than once.  Both opinions were rendered before Claimant had

13  any heart attacks, before the angiography, and before the bypass surgery.

14      The ALJ's ruling does not discuss any of this.  It does not discuss Dr. Lopez Ayala's July

15  2006 Cardiac Residual Functional Capacity Questionnaire responses at all.  It rejects her 2002 and

16  2004 opinions because she "apparently relied quite heavily on the subjective report of symptoms and

17  limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of

18  what the claimant reported" which the ALJ found lacked credibility.  The only other reason given

19  for rejecting the treating physician's opinion was the ALJ's failure to find any indication in the

20  treatment records of restrictions placed on the claimant by Dr. Lopez Ayala.

21      The ALJ's explanation is not sufficient under *Embrey, Magallanes, or Orn.*  It may be

22  specific (i.e., heavy and unquestioning reliance on the subjective report of symptoms and limitations

23  provided by the claimant and the failure to discover treatment restrictions in the physician's medical

24  records) but, given the objective medical findings with respect to claimant's Cardiac conditions, the

25  ALJ's explanation does not constitute "legitimate reasons supported by substantial evidence in the

26  record."  *Orn*, 495 F.3d at 633 (citations omitted).

27      The legal adequacy of the ALJ's ruling is undermined by the fact that it suggests that either

28  there were no objective findings regarding Claimant's cardiac impairments or that any such findings

were insufficient.  Dr. Lopez Ayala cited objective medical evidence in support of her cardiac assessment, including clinical signs and tests, as well as Claimant's description of symptoms.  To the extent the ALJ's ruling is based on *insufficient* objective findings, it is also inadequate.  Nowhere is the sufficiency of those findings discussed; there is no ALJ interpretation of those findings; and there is no explanation as to why the ALJ's interpretation of the objective medical findings, rather than that of Dr. Lopez Ayala, is correct.

The ALJ appears to base his rejection of Dr. Lopez Ayala's opinion largely on the ground that Claimant's reports of her pain and symptoms are suspect and not credible.[9]  The ALJ's conclusion that Dr. Lopez Ayala's opinion was based mostly, if not entirely, on Claimant's self-reports ignores the evidence that Dr. Lopez Ayala relied on objective clinical findings to support her opinions as to Claimant's cardiac impairments.  (AR 1023).

The Commissioner contends that there is substantial evidence of normal objective findings in Claimant's medical records to undermine the value of Dr. Lopez Ayala's opinions.  There are two problems with this argument.  First, the evidence cited by the Commissioner in support of this position pre-dated (1) Claimant's heart attack; (2) the angiography showing substantial occlusion of three ventricular vessels; and (3) Claimant's coronary bypass surgery.  The occurrence of these events severely undermines the value of the evidence to which the Commissioner points.  For the same reason, the opinions of Dr. Cahill and the unidentified state agency physician are of little, if any, utility; they, too, were rendered before the more severe cardiac episodes and interventions occurred.[10]  Second, to conclude that the record contains substantial evidence to support the ALJ's decision would require the Court to affirm the ruling on grounds the ALJ did not consider and analyze.  That is impermissible.  "We are constrained to review the reasons the ALJ asserts.  *SEC v.*

---

[9]  The ALJ did suggest that Dr. Lopez Ayala's failure to place restrictions on Claimant's activities discounts the value of the doctor's opinions.  The ALJ does not discuss what limitations or restrictions might have been appropriate *that Claimant was not already using*.  There is also evidence in this record that the doctor did advise Claimant to stop smoking.

[10]  Aside from questions about the continuing validity of these opinions based on subsequent events, the opinions of these doctors are given less weight than those of Dr. Lopez Ayala because each of them examined Claimant only once.  *Benecke v. Barnhart*, 379 F.3d 587, 592 (9th Cir. 2004).

1  *Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575 (1947); *Pinto v. Massanari*, 249 F.3d 840, 847-848

2  (9th Cir. 2001).  It [is] error for the district court to affirm the ALJ's ... decision based on evidence

3  that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

4        Even if there were substantial evidence in this record from another physician sufficient to

5  contradict Dr. Lopez Ayala's opinions, it would mean that the opinions of the treating physician was

6  no longer entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2).  "In that event, the ALJ is

7  instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in determining

8  what weight to accord the opinion of the treating physician.  Even when contradicted by the opinion

9  of an examining physician that constitutes substantial evidence, the treating physician's opinion is

10  "still entitled to deference."  S.S.R. 96-2p at 4, 61 Fed. Reg. at 34-491."  *Orn*, 495 F. 3d at 632-633.

11  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should

12  be adopted, even if it does not meet the test for controlling weight."  *Orn*, 495 F. 3d at 633.

13        Here, the ALJ's decision does not discuss the factors listed in 20 C.F.R. 404.1527(d)(2)-(6)[11]

14  in determining what weight to accord the opinions of the treating physician.  And even if

15  contradicted by an opinion of an examining physician that constituted substantial evidence, the

16  treating physician's opinion is still entitled to deference.  *Orn*, 495 F.3d at pp. 632-633.  It is difficult

17  to discern in the ALJ's decision any deferential treatment of Dr. Lopez Ayala's opinion regarding

18  Claimant's cardiac impairment and/or combination of impairments.

19        (d)   <u>Opinions regarding Claimant's mental health</u>

20        Nor does ALJ Berry's ruling sufficiently address the opinion of Claimant's treating

21  psychiatrist, Dr. Isabel Manuel, about the impacts of Claimant's depression on her ability to perform

22  work-related activities.  Dr. Manuel provided medical evidence in this case in the form of a

23  completed Mental Impairment Questionnaire (RFC & Listings).  (AR 1031-1036.)  Dr. Manuel

24  provided Claimant's diagnosis, prognosis, disability onset date, estimated duration, and a lengthy

25  description of Claimant's symptoms.  Dr. Manuel also submitted a completed Medical Source

26

27       [11] These include length of the treatment relationship and the frequency of examination;
nature and extent of the treatment relationship; supportability; consistency; specialization; and other

28  factors.  (*Id.*)

30

1  Statement of the Nature and Severity of an Individual's Mental Impairment.  (*Id.*)  None of this

2  information is mentioned in the ALJ's ruling.  The ALJ's only mention of Dr. Manuel's opinion is:

> Likewise, Dr. Manuel, the claimant's treating psychiatrist, reiterated her opinion that claimant is significantly depressed and comments that she is "stable" mean only that we are keeping her from being hospitalized" (Exhibit 41F, p. 2).  However, I have given [this] opinion less weight than would typically be warranted, as [it] reinforce[s] the consistent impression that the claimant will do whatever she needs to do to maintain a source of cash and a place to live."  (AR 823.)

7  ALJ Berry does discuss the opinions of the non-examining, non-treating psychiatrist,

8  Dr. Agler, at some length, and Dr. Agler's opinion does generally support a lesser degree of

9  impairment resulting from Claimant's mental health conditions than that identified by Dr. Manuel.

10  Nevertheless, ALJ Berry does not provide specific, legitimate reasons based on substantial evidence

11  for rejecting Dr. Manuel's opinion.  *See Andrew*s, 53 F.3d at p. 1043; *Magallanes*, 881 F.2d at pp.

12  752-753.

13  **B.      The ALJ's Assessment of the Vocational Expert's Testimony**

14  The ALJ found that Claimant could not perform any past relevant work.  (AR 823).  Having

15  reached this conclusion, the burden of proof shifted to the Commissioner to demonstrate that

16  Claimant could not perform other types of work available in the national economy.  *Perminter v.*

17  *Heckler*, 765 F.2d 870, 871-872 (9th Cir. 1985).  Claimant contends that the Commissioner failed to

18  do so because the hypothetical posed to the VE by the ALJ which formed the basis of the ALJ's

19  disability finding was based upon a flawed assessment of Claimant's RFC.[12]  As a result, Claimant

20  argues, there is not substantial evidence to support the conclusion Claimant was not disabled.

21  When a vocational expert is used in step five of the sequential evaluation process,

22  hypothetical questions asked of that expert must "set out all of the claimant's impairments." *Gallant*

23  *v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (quoting *Baugus v. Secretary of Health and Human*

24  *Services*, 717 F.2d 443, 447 (8th Cir. 1983)).  Moreover, "[t]he ALJ's depiction of the claimant's

25  disability must be accurate, detailed, and supported by the medical record." *Gamer v. Secretary of*

26

27  [12]  As noted earlier, the ALJ found that Claimant had the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently; could sit, stand, and/or walk six (6) hours each in an 8-hour workday; could perform simple, repetitive tasks, maintain attention, concentration, persistence and pace, relate to and interact with others, adapt to usual changes in work settings, and adhere to safety rules.  (AR 816).

28

*Health and Human Servs.*, 815 F.2d 1275, 1279-1280 (9th Cir. 1987). Here, because there is not substantial evidence to support the ALJ's conclusion regarding Claimant's RFC, given the flawed consideration of the medical opinion evidence, the VE's conclusions as to what jobs Claimant could perform and the availability of those jobs in the national economy must also fail.

C.       Remand is Appropriate

Claimant requests that the Court vacate and set aside the ALJ's denial of benefits, find that Claimant is disabled, and award benefits. As the Ninth Circuit instructs:

> Remand for further administrative proceedings is appropriate if
> enhancement of the record would be useful. Conversely, where the record
> has been developed fully and further administrative proceedings would
> serve no useful purpose, the district court should remand for an immediate
> award of benefits. More specifically, the district court should credit
> evidence that was rejected during the administrative process and remand
> for an immediate award of benefits if (1) the ALJ failed to provide legally
> sufficient reasons for rejecting the evidence; (2) there are no outstanding
> issues that must be resolved before a determination of disability can be
> made; and (3) it is clear from the record that the ALJ would be required to
> find the claimant disabled were such evidence credited. *Benecke*, 379 F.3d
> at p. 593.

Here, while the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Drs. Lopez Ayala and Manuel, it is not clear from this record that ALJ Berry would have found Claimant disabled were such evidence credited. Dr. Manuel's opinion as to the impacts of Claimant's mental health impairments on Claimant's work-related activities conflicted in significant ways with the opinion of Dr. Agler. Both opinions are entitled to consideration and weight. Dr. Agler's opinion also suggested that a more recent and comprehensive psychiatric evaluation, including psychometric testing, would be useful in arriving at more definitive conclusions about the status and impacts of Claimant's mental impairments. Similarly, a more complete record regarding Claimant's cardiac impairments and its impacts, particularly in combination with her other medically recognized impairments, appears to be important in reaching solid decisions as to Claimant's disability status. On remand, further use of a VE should be obtained as necessary.

**CONCLUSIONS AND RECOMMENDATIONS**

For the reasons discussed above, the Court finds error in the ALJ's analysis and conclusion that Claimant is not disabled. The Court also concludes that the ALJ's decision is not supported by

substantial evidence in the record as a whole or based on proper legal standards.  Accordingly, the Court RECOMMENDS that:

    1.  Plaintiff's social security complaint BE GRANTED, and

    2.  The matter BE REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further development of the record consistent with these findings and recommendations, with respect to Plaintiff's cardiac health and mental health impairments and their impact on Plaintiff's ability to perform work-related activities; and for further consideration consistent with these findings and recommendations, of (a) the weight and deference to be accorded the opinions of Plaintiff's treating physicians, (b) Plaintiff's residual functional capacity, and (c) whether Plaintiff cannot engage in any other substantial gainful work which exists in the national economy; and

    3.  Judgment BE ENTERED for Plaintiff Rose Mary Duncan against Defendant Michael J. Astrue.

    These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72-304.  No later than eleven (11) days after service of these findings and recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings  and Recommendations."  Responses to the objections shall be filed and served no later than eleven (11) days after service of the objections. **Plaintiff and Defendant are forewarned that no extensions of time to file objections or responses will be granted.**  The District Judge will review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **February 15, 2009**                        **/s/ Theresa A. Goldner**

                                       UNITED STATES MAGISTRATE JUDGE